UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DARRELL GUNN,

                        Plaintiff,                              **MEMORANDUM OF LAW**

            -vs-                                                **16-CV-6206**

CHAD BESCLER, et al.,

                        Defendants.

_____

## PRELIMINARY STATEMENT

What remains of this action commenced by the plaintiff, Darrell Gunn (03B2443), an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), are allegations that Plaintiff was sexually assaulted by two officers during three pat frisks in 2013, certain other officers failed to intervene, he was subjected to cold conditions in his cell in January 2014, and he was retaliated against in various ways throughout those events.  As this Court has previously recounted: "On March 31, 2016, Plaintiff . . . commenced this action by filing a 146-page Complaint [#1] against twenty-five DOCCS employees."  Docket No. 32 at p. 1.  Following the denial of Plaintiff's application to proceed *in forma pauperis* and dismissal of the action, "[o]n April 27, 2016, Plaintiff filed a new application to proceed in forma pauperis, along with a 190-page Amended Complaint [#6], involving thirty (30) separate claims and twenty-seven (27) defendants." *Id.* at p. 2.  Next, "[o]n January 19, 2017, in a 42-page Order [#9], the Court granted Plaintiff's application to proceed in forma pauperis, reviewed the Amended Complaint, dismissed many of the claims, and permitted other claims to go forward."  Specifically, the Court dismissed twenty "of the thirty enumerated 'counts' in the Amended Complaint," and all except two of the twenty claims were dismissed

1

with prejudice. *Id.* at p. 3 (listing claims). Plaintiff requested to further amend, which the Court

granted but "only as to those claims in the Amended Complaint that had been dismissed without

prejudice." *Id.* at p. 4.

On June 8, 2017, Plaintiff submitted a 110-page proposed Second Amended Complaint

("SAC") against twelve defendants. *Id.* at p. 4. "On September 6, 2018, the Court issued an

Order [#15] granting the motion and dismissing certain claims with prejudice. The practical

effect of the Court's Order [#15] is that the claims that were allowed to go forward were the

same claims that were previously permitted to go forward by the Court's Order [#9], except for

one additional claim against a John Doe defendant." *Id.* at p. 4. Thereafter, the Court granted the

defendants' motion to dismiss three of the remaining claims (Counts Five, Six, and Ten[1] in the

SAC) and terminated A. Coles as a defendant. *See* Docket No. 32 at p. 10 & 14. Most recently,

this Court granted a motion for judgment on the pleadings filed by Defendant Harkness (Count

Four), who had been identified as the John Doe Defendant in the SAC. *See* Docket No. 65.

Thus, the following claims are the subject of this Motion:

(1) sex assault (Corrections Officer Perry) [COUNT ONE][2];
(2) failure to protect (Corrections Sergeant Claflin) [COUNT TWO];
(3) excessive force (Corrections Officer Beschler) and failure to protect (Beschler, Claflin) [COUNT THREE];
(15) retaliatory pat frisk (Perry) [COUNT SEVEN];
(19) sexual assault during pat frisk (Corrections Officer Schieber) and retaliatory false misbehavior report (Schieber) [COUNT EIGHT];
(28) cold cell conditions of confinement (Schieber) and retaliation (Schieber) [COUNT NINE];
(30) sexual advances (Schieber) [COUNT ELEVEN].

As detailed below, Plaintiff's remaining claims should be dismissed. Regarding "Count

One," "Count Two," and "Count Three," Plaintiff's allegations about March 29, 2013 were

---

[1] Although this Court refers to the claim "alleging a sexual assault by Perry on January 24, 2014" as "Count Eleven," the corresponding count number in the SAC is actually "Count Ten."
[2] For ease of review, the corresponding count number per Plaintiff's subsequent Second Amended Complaint are set forth in CAPS and brackets.

already unsuccessfully tried by Plaintiff, and no reasonable factfinder could find any Eighth Amendment violations by Perry, Claflin, and Beschler. As to "Count Seven," there is no evidence that the June 11, 2013 pat frisk was retaliatory. "Count Eight," "Count Nine," and "Count Eleven should be dismissed because there is no disputed question of fact as to whether Schieber sexually assaulted Plaintiff, was personally involved in (let alone deliberately indifferent to) cold conditions in Plaintiff's cell, and the alleged verbal harassment does not rise to the level of a constitutional violation. Finally, Defendants are entitled to qualified immunity as they did not violate any clearly established law in effect at the time of the events.

## FACTS

All of the events in this lawsuit occurred at Elmira Correctional Facility ("Elmira"), a maximum security facility in Elmira, New York. It is standard procedure for inmates to be subject to random pat frisks, including when going to recreation. McKay Decl., Exh 1 at 44/21-45/23. Pat frisks are necessary because inmates are known to hide contraband, including weapons, drugs, and noxious substances on their persons, even in their buttocks and underneath their genitals. Perry Decl ‖ 12; Claflin Decl ‖ 5; McKay Decl., Exh 2 at 29/10-21. Hence, proper pat frisk procedure consists of patting down above the clothing the inmate's entire body, including their arms, legs, torso, neck, buttocks, and genital area, while feeling for anything that could be considered contraband. Claflin Decl. ‖ 4-5; McKay Decl., Exh 2 at 70/19-21. Plaintiff believes that the three pat frisks at issue in this lawsuit were "needless" because he did not set off the metal detector when he went through it. McKay Decl, Exh 1 at 61-62; 127-128; 2-37. However, not all contraband sets off the alarm. Perry Decl. ‖ 10; Schieber Decl ‖ 9. Plaintiff admits that he was not always selected for random pat frisks, and he believes all the pat frisks he experienced were sexually assaultive. McKay Decl, Exh 1 at 125/13-20; Exh 2 at 66/5-1.

On March 29, 2013, Plaintiff was pat frisked by Correction Officer Perry while on his way to evening recreation. McKay Decl, Exh 1 at 58/7-16. Plaintiff claims that C.O. Perry, whom Plaintiff had never met before, is a sexual predator with "sexual indecencies." *Id.* 61/15-18, 83/24-84/5. C.O. Perry told Plaintiff to put his hands on the wall and then began pat frisking him, starting with his arms and then going to his waist. *Id.* 62/21-25. Plaintiff alleges that C.O. Perry grabbed the waistband of his underwear and pulled it into his rectum; Plaintiff said he was in pain and C.O. Perry told him to shut the fuck up. *Id.* 63/21-25. C.O. Perry next frisked Plaintiff's legs, and pulled his underwear up a second time, put his hands between Plaintiff's buttocks, and penetrated Plaintiff's rectum through his clothes. *Id.* 64/2-66/17. There was no skin-to-skin contact; Plaintiff was wearing boxers and state-issued greens, and C.O. Perry was wearing frisk gloves. *Id.* 65/4-20. The penetration was "quick" and happened "instantaneously" as the officer's hands moved back and forth between Plaintiff's legs. *Id.* 67/2-13. Then, Plaintiff's shoes were checked, and he was told to return to his cell. *Id.* 68/3-16.

Plaintiff alleges that C.O. Beschler and Sergeant Claflin failed to intervene to prevent the sexual assault. Plaintiff had also not met those two officers before March 29, 2013. *Id.* 86/15-87/2. During the frisk, C.O. Beschler was somewhere behind C.O. Perry, who is a "big guy," and used a handheld metal detector when it was time to check Plaintiff's shoes. *Id.* 58/10-16; 69/10-70/13. Plantiff alleges that Sergeant Claflin, who was supervising the frisks of multiple inmates, "promoted" the sexual assault by coming closer during the frisk "to block the view of other people from seeing" it. *Id.* 76/11-77/11.

After the frisk, Plaintiff asked C.O. Perry for his name and the officer gave it to him. *Id.* 79/11-22. As Plaintiff walked back to his cell, C.O. Beschler kicked him in the shin, "practically tripping" him. *Id.* 78/2-19, 82/16-18. Several hours later, C.O. Perry passed Plaintiff's cell and

Plaintiff accused him of sexual assault; C.O. Perry responded, "If I sexually assaulted you, it would have been worse than that." *Id.* 83/4-8.

Plaintiff wrote up a sick call slip to report the sexual assault. *Id.* 111/4-6. His medical exam took place two days later on March 31, 2013. McKay Decl, Exh 10 at p. 4. Plaintiff had no visible injuries, and he did not even mention the alleged kick to his shin. McKay Decl, Exh 1 at 92/10-15, 116/18-20. No hemorrhoid or other injuries were observed at that time. McKay Decl., Exh 9. On April 4, 2013, Plaintiff was found to have a small hemorrhoid. McKay Decl., Exh 10 at p. 5. No medical staff has ever told Plaintiff that his hemorrhoids were caused by the pat frisk. McKay Decl, Exh 1 at 96/4-10. Plaintiff has no medical proof that penetration through multiple layers of clothes would cause a hemorrhoid. *Id.* 96/15-17. Every time Plaintiff has had a hemorrhoid, it has gone away with hemorrhoid cream. *Id.* 95/11-22. Plaintiff initially testified that he had no mental health issues prior to the March 29, 2013 incident, but he then admitted to being diagnosed with depression in 2002. *Id.* 97/3-10, McKay Decl, Exh 2 at 93/3-14. According to a mental health provider with whom Plaintiff had good rapport, Plaintiff would make claims about having been sexually assaulted, but his "blanket statements" did not typically follow "generally accepted definitions of these things." *Id.* 124/6-21; McKay Decl, Exh 18.

On June 11, 2013, C.O. Perry again pat frisked Plaintiff prior to evening recreation. McKay Decl, Exh 1 at 123/6-8. C.O. Perry started with Plaintiff's arms, then his waist, pulled up his underwear, and then went down his legs. *Id.* 126/2-18. He then put both hands between Plaintiff's buttocks and moved them back and forth, which, according to Plaintiff, was an attempt to penetrate his rectum. *Id.* 126/19-127/9. However, there was no penetration. *Id.* 127/8-11. Nothing was said during this pat frisk. *Id.* 129/3-7. Plaintiff does not claim any physical injuries from this pat frisk. *Id.* 131/2-6.

On July 26, 2013, Plaintiff was pat frisked while on his way to the field house for recreation. McKay Decl, Exh 2 at 21/15-20. The frisk was conducted by C.O. Schieber, whom Plaintiff had never met before that day. *Id.* 20/11-13. C.O. Schieber started by checking Plaintiff's arms, and he patted down Plaintiff's torso and legs, as well. *Id.* 26/18-25, 28/16-20. When C.O. Schieber got to Plaintiff's waist area, he began trying to penetrate Plaintiff's rectum through his clothing. *Id.* 26/25-27/2. Although there was no skin-to-skin contact, Plaintiff claims that there was "brief" penetration for "two seconds." *Id.* 27/3-11. Nothing was said during the pat frisk; after it was done, Plaintiff asked the officer for his name and the officer told him. *Id.* 30/2-10.

According to a misbehavior report authored by C.O. Schieber, Plaintiff stared at him after the frisk, and when C.O. Schieber told Plaintiff to go to rec, Plaintiff began verbally threatening him saying, "I will have your job," and "just wait till you see me again." McKay Decl, Exh 14. Plaintiff alleges that C.O. Schieber "filed [the] misbehavior report against [Plaintiff] because [Plaintiff] was going to file a sexual assault claim against him." *Id.* 42/12-43/2. Plaintiff has no proof of that C.O. Schieber was worried he would file a sexual assault claim. *Id.* 43/3-5. Plaintiff was then ordered to return to his cell. *Id.* 39/22-40/2. According to Plaintiff, he had to use the bathroom, and he experienced a bowel movement as he walked back to his cell. *Id.* 27/18-28/7.

In January 2014, one or more windows in Plaintiff's gallery were opened at some point in the night and remained open until dinner the next day at the latest. *Id.* 51/23-52/22. Plaintiff was asleep and does not know which officer opened it, but he believes it was at the request of another inmate. *Id.* 52/2-11. When Plaintiff awoke in the morning, he became aware of what had transpired. *Id.* 55/10-21. There were six officers working in the area while the window was open, and none of them was C.O. Schieber. *Id.* 61/9-12, 64/7-9. Plaintiff did not see C.O.

Schieber until he came to take the inmates to recreation at approximately 7:00 p.m., by which time the window had been closed. *Id.* 64/7-25.

On the way to rec, C.O. Schieber pat frisked inmate Greene, who was sent back to his cell for wearing improper clothing. *Id.* 68/4-17, 71/4-15. Because inmate Greene was gone from the block by the time Plaintiff returned, Plaintiff assumed that C.O. Schieber had beaten him up. *Id.* 72/2-23, 73/13-74/8. Based on his assumption, Plaintiff reported C.O. Schieber to the Office of Special Investigations ("OSI") for the alleged beating and open windows. *Id.*

Plaintiff's final remaining claims allege that C.O. Schieber retaliated against him for reporting him to OSI. *Id.* 71/21, 74/25-76/23. Specifically, on February 3, 10, 11, and 12, 2014, Plaintiff alleges that C.O. Schieber made sexual advances and threats in retaliation and for "sexual gratification" because the officer is "a homosexual." *Id.* 84/10-16. There is no evidence that C.O. Schieber ever even knew about Plaintiff's report to OSI; Plaintiff did not tell anyone about it, and C.O. Schieber has never been interviewed by an OSI investigator. *Id.* 85/5-11; Schieber Decl. at 22. When Plaintiff was asked how he knows that C.O. Schieber was aware of it, Plaintiff merely insisted, "Because they always know." McKay Decl Exh 2, at 77/6-10. Regarding the result of the investigation, meanwhile, Plaintiff testified, "They found out there was no merit." *Id.* 80/5-8.

## STANDARD OF REVIEW

Summary judgment is appropriate where the moving papers and affidavits submitted by the parties "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S. Ct. 2505 (1986). The moving party bears the burden of "informing the

district court of the basis for its motion," and demonstrating "the absence of a genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323, 91 L.Ed.2d 265, 106 S. Ct. 2548 (1986).

However, to survive a summary judgment motion, the non-moving party has to "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322; *see* Fed. R. Civ. P. 56(e). In making its decision, the district court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *American Casualty Co. of Reading, Pennsylvania v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir. 1994), *quoting Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir. 1993). A grant of summary judgment is appropriate when no rational jury could find in favor of the non-moving party because there is no genuine issue of material fact. *Gallo v. Prudential Residential Services, Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

I.    **"COUNT ONE," "COUNT TWO," AND "COUNT THREE" REGARDING MARCH 29, 2013 SHOULD BE DISMISSED**

Plaintiff alleges that, on March 29, 2013, C.O. Perry sexually assaulted him during a pat frisk, while Sergeant Claflin and C.O. Beschler failed to protect him from it, and C.O. Beschler kicked and "practically tripp[ed]" him, from which Sergeant Claflin also failed to protect him. For the reasons that follow, all these claims should be dismissed.

A.    **Plaintiff already got a trial on the March 29, 2013 allegations and lost.**

As an initial matter, Plaintiff already had a Court of Claims trial about March 29, 2013, and he did not prevail. A second trial on these claims would impair the state court's judgment.

As this Court has explained:

"*Res judicata* is a common-law concept which prescribes that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94 (1980) (citing

8

*Cromwell v. County of Sac,* 94 U.S. 351 (1876)). *Res judicata* and the related concept of collateral estoppel (which refers to issue preclusion) are intended to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Id.* (citing *Montana v. United States,* 440 U.S. 147, (1979)). *Res judicata* bars the relitigation of the same claim or cause of action while *collateral estoppel* bars the relitigation of the same issue."

*Singletary v. Astrue*, No. 07-CV-6025, 2008 WL 1323892, at *3 (W.D.N.Y. Jan. 22, 2008).

It is collateral estoppel that applies in this case. In New York, collateral estoppel "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same." *Burgos v. Hopkins*, 14 F.3d 787, 792 (2d Cir. 1994), *quoting Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 500 (1984). "Collateral estoppel requires: (1) an issue that has been decided in a prior action and is decisive of the present action; and (2) that there has been a full and fair opportunity to contest the decision now said to be controlling." *Smalls v. Rathbum*, 2019 WL 2433892, at *3 (W.D.N.Y. June 11, 2019), *citing Burgos*, 14 F.3d at 792; *Schwartz v. Pub. Adm'r of Bronx Cnty.*, 24 N.Y.2d 65 (1969). "The moving party bears the burden of showing the 'identicality and decisiveness of the issue,' rests upon the party seeking the benefit of collateral estoppel, while the burden to establish the absence of a full and fair opportunity to litigate the issue in the prior action rests on the party contesting its application." *Id.*, citing *Ryan*, 62 N.Y.2d. at 502.

"[C]ourts have correctly and 'repeatedly held that a [plaintiff] may not bring a § 1983 claim against individual officers where [s]he has previously lost at trial against the State in the Court of Claims on state law claims arising out of the identical alleged incident.'" *Schiff v. Stevens*, No. 15CV3598, 2017 WL 65432, at *5 (E.D.N.Y. Jan. 6, 2017), citing *Goodson*, 212 F. Supp. 2d at 258; *see also*, *e.g.*, *Rivera v. Patnode*, No. 9:11-CV-0532 MAD/ATB, 2012 WL 1029661, at *5 (N.D.N.Y. Mar. 26, 2012); *Wright v. Coughlin*, No. 85 CIV. 0624 (LBS), 1987

WL 19633, at *2 (S.D.N.Y. Nov. 5, 1987), *aff'd*, 868 F.2d 1268 (2d Cir. 1988). "That the Court of Claims is unable to consider federal constitutional causes of action is of no moment if the issues raised before it implicate the same operative facts at bar in the subsequent litigation." *Id.*

Here, collateral estoppel clearly bars Plaintiff's claims regarding March 29, 2013, since Plaintiff already had a trial on that incident and lost. "Although the Court of Claims never considered the action as a civil rights issue nor as one against the individual officers, the Court of Claims did conclusively resolve the same set of facts on which both claims exist." *Wright*, 1987 WL 19633 at *2, *aff'd*, 868 F.2d 1268 (2d Cir. 1988). Indeed, after hearing testimony from all the same parties to the claim in this case, Judge Schaewe found both that the alleged acts would have fallen outside the scope of employment, and furthermore that Plaintiff, who "was not a credible witness," utterly failed to prove that he was assaulted. McKay Decl., Exh 3 [Ct of Claims Decision] at p. 11; *see also* McKay Decl., Exhs 4, 5, 6, 7, & 8. In contrast, Judge Schaewe found "Perry, Claflin, and Besc[h]ler were convincing witnesses," and ultimately concluded, "[i]t is apparent that claimant was subjected to a random pat/frisk search in accordance with prison directives, a procedure to which he had apparently not been previously subjected, and he interpreted it as a sexual assault." McKay Decl., Exh 3 at p. 11-12. "These issues were decided by the Court of Claims and are dispositive of th[is] action." *Schiff*, 2017 WL 65432, at *5. Accordingly, Plaintiff's claims involving March 29, 2013, including his sexual assault claim against C.O. Perry, excessive force claim against C.O. Beschler, as well as his failure to protect claims against Sergeant Claflin and C.O. Beschler, should be dismissed with prejudice. Plaintiff is not entitled to yet another trial about the same events, which would amount to giving him a second bite at the apple, and "impair the finding by Judge Schaewe in favor of defendants," *Shell v. Brun*, 362 F.Supp.2d 398, 401 (W.D.N.Y. 2005) (Larimer, J.).

**B. No reasonable factfinder could find an Eighth Amendment sexual assault.**

At his deposition, Plaintiff made clear that he is claiming that two aspects of Perry's pat frisk on March 29, 2013, were sexually assaultive, namely, rubbing between his buttocks and the "quick" and "instantaneous[]" penetration of Plaintiff's anus through his clothes. McKay Decl., Exh A at 72/2-10. Because proper pat frisk procedure requires the officer to run his hands over the inmate's buttocks, and because Plaintiff's dubious claim of being penetrated for an instant through his pants, even if credited for purposes of this motion only, fails to rise to the level of a constitutional claim, this claim should be dismissed.

In *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d. Cir. 1997), the Second Circuit held that sexual abuse by a corrections officer may constitute cruel and unusual punishment if it is "severe or repetitive." That Court has since clarified the *Boddie* standard, stating, "[a] single incident of sexual abuse, if sufficiently severe or serious, may violate an inmate's Eighth Amendment rights no less than repetitive abusive conduct." *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d. Cir. 2015). "The principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat-frisk or strip search, or by contrast whether it is undertaken to arose or gratify the officer or humiliate the inmate." *Id*. at 257-58. The Eighth Amendment requires courts to, "look beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society." *Id.* at 259, quoting *Graham v. Florida*, 560 U.S. 48, 58 (2011).

In order to prevail on a sexual abuse claim, an inmate need not allege that there was penetration, physical injury, or direct contact with uncovered genitalia. *Id*. at 257. Rather, "[a] corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." *Id.* On the other hand, the

Court continued, "prison security and safety may require frequent searches of an intensely personal nature—and not every such search is properly the subject of a lawsuit. Searches that do not uncover contraband may be no less penologically justified than those that do. And even an officer who is meticulous in conducting a search does not violate an inmate's constitutional rights as long as the officer had no intention of humiliating the inmate or deriving sexual arousal or gratification from the contact." *Id*. at 258.

Here, Plaintiff's conclusory claims demonstrate his mere disagreement with the pat frisk procedure itself. At his deposition, Plaintiff admitted his belief that *every* pat frisk he received during this time was performed in a sexually inappropriate manner, and was "needless" due to his not having set off the metal detector. McKay Decl., Exh 1 at 62/4-10. Applying constitutional standards, however, the undisputed record evidence demonstrates C.O. Perry made, at most, brief contact with Plaintiff's buttocks during a routine pat frisk. *See id.* at 72/2-10; *Llewellyn v. Aldi*, No. 3:19-CV-1030, 2019 WL 4139484, at *7 (D. Conn. Aug. 30, 2019). "'Slight contact of this sort is to be expected during a frisk,' *Cole v. Suffolk Cty. Corr. Facility*, 2020 WL 2113205, at *4, and is inherent in an officer's pat-down of an inmate's person to search for contraband." *Vann v. Sudranski*, No. 16 CV 7367, 2020 WL 3001072, at *6 (S.D.N.Y. June 4, 2020).

Furthermore, Plaintiff was fully clothed during the frisk, C.O. Perry checked the other parts of Plaintiff's body per standard procedure, and "the frisk was conducted in the presence of several other officers, inmates, and at least one supervisor, and was incidental to legitimate penological duties." *Id*.; McKay Decl., Exh A at 62/14-25, 64/2-6, 68/5-16. Plaintiff does not dispute that C.O. Perry did not say anything of a sexual nature. *See* McKay Decl., Exh 1 at 63/24-25, 74/3-10; *Torres v. City of New York*, No. 17-CV-6604, 2019 WL 4784756, at *5 (S.D.N.Y. Sept. 30, 2019) (dismissing plaintiff's sexual abuse claim where officer touched his

buttocks during contraband search but had not "said anything of a sexual nature during the course of the search"). "Numerous district courts in the Second Circuit have found similar such physical conduct to not rise to the level of an Eighth Amendment violation." *Allen v. Graham*, No. 916CV0047, 2019 WL 4784756, at *6 (N.D.N.Y. Dec. 1, 2017) (collecting cases and dismissing sexual assault claim where the plaintiff established, "at most," that the officer who frisked him "made a few callous and/or offensive remarks while caressing Plaintiff's chest and repeatedly groping Plaintiff's genitals and buttocks"); *see also Shaw v. Prindle*, 661 Fed. Appx. 16, 19 (2nd Cir. 2016) (affirming dismissal of plaintiff's claim that "excessive searching of his 'crotch area and…in between [his] buttocks' and massaging of his 'rectum and groin area.'").

The case *Jones v. Rock*, No. 12-CV-0447, 2013 WL 4804500, at *19 (N.D.N.Y. Sept. 6, 2013)[3] is informative. In that case, the Northern District granted an officer's motion for judgment on the pleadings where the plaintiff alleged penetration through his clothes, as follows:

> "Defendant Corrections Officers Lavigne and Dwyer were the escort officers responsible for taking inmates assigned to the ASAT program from their cells, frisking them, and escorting them to the program. On May 4, 2010, Plaintiff was handcuffed and led out of his cell by Lavigne and Dwyer for a pat-frisk. Dwyer held Plaintiff's hands above his head and against the wall by the handcuffs, while Lavigne did the patfrisk. According to Plaintiff, Lavigne pulled Plaintiff's pants up as high as they would go causing Plaintiff to wince in pain. Lavigne allegedly screamed at Plaintiff, "don't move or we will take you down," and shoved his fingers between Plaintiff's buttocks with such force that one of his fingers, along with Plaintiff's pants and underwear, invaded Plaintiff's anus. Plaintiff has alleged that when he screamed, Dwyer laughed and said, "oh, you're still a virgin, don't worry about it, we'll take care of that." Lavigne then groped Plaintiff's genitals and squeezed them until Plaintiff cried out in pain. Lavigne became verbally abusive, screaming in Plaintiff's face and smelling strongly of alcohol, and yelling at Plaintiff the entire way to the ASAT program."

---

[3] Although *Jones* was decided prior to *Crawford*, the Northern District correctly interpreted the *Boddie* standard and did not dismiss the sexual assault claim simply because the plaintiff had alleged only a single instance of sexual assault.

*Id.* at *3 (internal citations omitted). Ultimately, "[w]hile by no means condoning the acts alleged," that Court noted that the plaintiff had "alleged only a single instance of alleged sexual abuse by Lavigne, the actions were not extreme or severe when measured against the case law cited herein, and Plaintiff has alleged no physical injury." *Id.* at *19. It was also important to the constitutional analysis that the defendant-officer "was performing a pat-frisk, which has a penological purpose," as the inmate had been on his way to ASAT program. *Id.* For all those reasons, the Court found "that Plaintiff ha[d] not stated a plausible claim against him for sexual abuse or assault in violation of the Eighth Amendment." *Id.*

Here, too, Plaintiff alleges only that C.O. Perry pulled up his underwear and, while checking between his buttocks, the officer's finger, along with Plaintiff's pants and underwear, "invad[ed] plaintiff's anus." *Id.* at *3. Thus, even setting aside how doubtful it is that penetration could occur through two or more layers of clothing, Plaintiff has no proof whatsoever that it was intentional. Given that proper pat frisk procedure necessarily entails some intimate contact, including running one's hands over an inmate's groin and buttocks, there is simply no evidence that C.O. Perry intended to have contact with Plaintiff's rectum. *See Davis v. Castleberry*, 364 F. Supp. 2d 319, 321 (W.D.N.Y. 2005) ("It is obvious that '[a]ny manual search of an individual's body will require some amount of manipulation of the genitals in order to accomplish the purpose of the search. Although 'grabbing' and 'tugging' could cause some discomfort and embarrassment, it does not rise to the level of 'unnecessary and wanton infliction of pain' so long as it occurs as part of an otherwise justified search.").

C.O. Perry made no statements indicating an intent to sexually assault Plaintiff, nor even an awareness that the alleged penetration had occurred after the fact. McKay Decl., Exh 1 at 63/24-25, 74/3-10. To the contrary, later that day when Plaintiff accused him of sexual assault,

C.O. Perry responded, "If I sexually assaulted you, it would have been worse than that." *Id.* at 83/4-17; *cf. Hayes v. Dahlke*, 976 F.3d 259, 274–76 (2d Cir. 2020) (finding disputed question of fact where five to eight-minute patfrisk involved lifting up and massaging the inmate's testicles and officer who "pressed" his "lower body (genitals) . . . up against" the plaintiff's behind in a manner that, if credited, would appear to have no legitimate purpose in a bona fide pat search," and "followed up that physical contact with a verbal barrage" of demeaning comments). Clearly, C.O. Perry was not aware of, and did not intend to have, any intimate contact with Plaintiff.

Briefly, Plaintiff claims to have gotten a hemorrhoid from the pat frisk, but that does not change the fact that the alleged force was *de minimus* and Plaintiff has no medical proof. McKay Decl., Exh A at 96/4-17. On March 31, 2013, Plaintiff was examined and he had no injuries. McKay Decl, Exh 9. Further, although a hemorrhoid was identified about a week later on April 4, 2013, causation cannot be established given that hemorrhoids are such a run-of-the-mill medical condition generally associated with straining during bowel movements. Plaintiff's hemorrhoids have always been minor and resolved with topical cream. McKay Decl., Exh 1 at 95/11-22. Simply put, Plaintiff, who admits to having irritable bowel syndrome, McKay Decl., Exh 2 at 99/10-12, has no medical evidence that his hemorrhoids were—or even could have been—caused by brief penetration of the anus through clothing. McKay Decl., Exh 1 at 96/4-17.

Lastly, Plaintiff's self-serving accusations that C.O. Perry, whom Plaintiff had never even met before March 29, 2013, McKay Decl., Exh A at 83/24-84/5, "is a sexual predator," who selected Plaintiff for the pat frisk out of the group of inmates going to recreation "for his sexual indecencies," McKay Decl., Exh A at 61/15-18, are conclusory and wholly unsupported by the record. *See Colon v. Annucci*, 344 F. Supp. 3d 612, 643–44 (S.D.N.Y. 2018) ("The only allegation regarding [defendant] Holzapfel's intent or state of mind is that he was acting 'to

satisfy his homosexual proclivities,' but Plaintiff provides *no* facts substantiating this assertion. Instead, as alleged, Holzapfel stated that he was "conducting a body pat frisk for suspicion of contraband," and when Plaintiff protested, he told him to "shut-up or get written-up for refusing a body [p]at [f]risk." Holzapfel is not alleged to have made any sexually inappropriate comments or gestures."). For all these reasons, there is no way that a reasonable factfinder could conclude that Perry used sexually assaultive force on Plaintiff or acted with the requisite intent to "arouse or gratify [himself] or humiliate the inmate." *Crawford*, 796 F.3d at 257-58.

### C. Sergeant Claflin and C.O. Beschler had no knowledge that a sexual assault occurred, nor a realistic opportunity to intervene.

Next, no reasonable fact finder could conclude that Sergeant Claflin or C.O. Beschler unconstitutionally failed to intervene to stop a sexual assault. Of course, "[a]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). "Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be." *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 21 (2d Cir. 2012) (summary order) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)). "However, 'in order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.' " *Id.* (citing *Anderson v. Branen*, 17 F.3d at 557).

"To establish liability under a failure to intervene theory, 'a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration: 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable

measures to end the use of excessive force." *Tompkins v. Beane*, No. 9:10-CV-1200, 2012 WL 3079537, at *5 (N.D.N.Y. July 30, 2012).

Here, Plaintiff cannot demonstrate that any of the three elements are satisfied. First, there is no evidence that Sergeant Claflin or C.O. Beschler had actual knowledge of unconstitutional conduct. C.O. Perry, whom Plaintiff describes as a "big guy," was standing directly behind Plaintiff, who admits he did not have a good view, but claims the other officers were located somewhere off to the side. *See* McKay Decl., Exh A at 58/14-16; 69/24-71/2. After the pat frisk, C.O. Beschler merely operated the hand-held metal detector, and there were other staff and inmates in Plaintiff's group on their way to rec. *Id.* at 59/15-17, 69/10-14. Furthermore, it is undisputed that no skin to skin contact occurred during the sexual assault, meaning that C.O. Perry would not have made any obvious movements such as reaching inside Plaintiff's pants. McKay Decl., Exh 1 at 65/24-66/2. As Plaintiff concedes, pat frisks necessarily entail checking the inmate's buttocks and genitals for weapons and contraband. McKay Decl., Exh 2 at 70/19-21. Thus, all that would have been apparent to Sergeant Claflin and C.O. Beschler was that a pat frisk was occurring; they could not have known that any penetration occurred when Officer Perry lawfully checked Plaintiff's buttocks outside of his pants.

Nor did Sergeant Claflin and C.O. Beschler have a realistic opportunity to intervene to prevent the alleged harm from occurring. According to Plaintiff, when the penetration occurred, it was "quick," and happened "instantaneously" with the checking of his buttocks. *Id.* at 67. There were no statements made before or at the time of the alleged penetration that would have alerted those nearby to the fact that a sexual assault was about to occur or was occurring: Plaintiff's only statement was that he was "in pain" when CO Perry pulled up his underwear, to which Plaintiff alleges that C.O. Perry responded, "Shut the fuck up," but such an exchange

would hardly put the surrounding officers on notice that Officer Perry was going to penetrate Plaintiff anally. *See* McKay Decl., Exh 1 at 63/24-64/17. Nothing else was said until after the pat frisk was completed, when C.O. Perry merely ordered Plaintiff to "take it back to his cell," and Plaintiff asked the officer for his name. *Id.* at 67/24-68/4, 74/3-10. Thus, "[t]he evidence does not support any claim that [Claflin and Beschler] witnessed the allegedly unlawful conduct, encouraged or acquiesced in such conduct, or had a realistic opportunity to prevent the alleged use of excessive force from occurring." *Vann*, 2020 WL 3001072, at *6.

**D. There is no evidence of excessive force by C.O. Beschler.**

Plaintiff's final claim about March 29, 2013 is that C.O. Beschler used excessive force on him when Beschler kicked his left shin, "practically tripping" him, as Plaintiff walked back to his cell. Docket No. 1 at ¶ 73; McKay Decl., Exh 1 at 82. This claim should also be dismissed.

"To establish a constitutional violation under the Eighth Amendment a plaintiff must meet both an objective and a subjective requirement. To satisfy the objective requirement the plaintiff must prove that the violation is sufficiently serious or harmful enough by objective standards. The objective component is context specific, turning upon contemporary standards of decency. Hence, a de minimis use of force will rarely be sufficiently serious or harmful enough." *Kornegay v. New York*, 677 F. Supp. 2d 653, 660 (W.D.N.Y. 2010). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates a prisoner's constitutional rights," *Boddie*, 105 F.3d at 862 (citation omitted), and "not even every malevolent touch by a prison guard gives rise to a federal cause of action." *Id*. at 862.

Here, Plaintiff testified at his deposition that he had to walk past CO Beschler to get back to his cell, McKay Decl., Exh 1 at 76/19-21; 78/13-22; 79/23-80/22, and there is no evidence that the single "kick" that caused Plaintiff to trip as he passed the officer was sufficiently deliberate

to satisfy the subjective component. Nothing was said between Plaintiff and Beschler, and Plaintiff's claim that Beschler heard Plaintiff ask Officer Perry for his name and kicked him because he thought he might later file a grievance, is entirely speculative.[4] *Id.* at 80/20-82/2.

With respect to the objective prong, meanwhile, Plaintiff claims to have experienced some initial pain in his shin, which did not require medical treatment, and which he chose not to even report to medical staff. *See* McKay Decl., Exh A at 92/10 to 93/5. This is reflected by the absence of any such injury anywhere in his medical records. *See* McKay Decl, Exh 10 [P MED RECS]. Even viewing the record in the light most favorable to plaintiff, the alleged "kick" by Officer Beschler "was nothing more than a 'push or shove,' and it was certainly not 'of a sort repugnant to the conscience of mankind.'" *Kornegay*, 677 F. Supp. 2d at 660; *see Washington v. Afify*, 968 F. Supp. 2d 532, 536 (W.D.N.Y. 2013) (dismissing inmate-plaintiff's claim that, "during a strip search, defendant Jayne 'kicked [him] after telling [plaintiff] to bend over and spread [his] butt cheeks,'" where the plaintiff "does not allege that the kick was particularly forceful or that it caused him any pain or injury, and this *de minimis* use of force is not enough to support an Eighth Amendment claim."); *Gonzalez v. Coughlin*, No. 92 Civ. 7263, 1996 WL 496994, at *4–*5 (S.D.N.Y. Aug. 21, 1996) (finding no excessive use of force where plaintiff alleged that correction officers tripped him to the ground and hit him in the knee). Accordingly, Officer Beschler should be terminated from this lawsuit.

Briefly, because C.O. Beschler did not use excessive force, Plaintiff's claim that Sergeant Claflin failed to protect Plaintiff from that force should likewise be dismissed. In any event,

---

[4] To the extent that Plaintiff intended to raise a retaliation claim involving these events, it also would have lacked merit. "As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." *Daum v. Racette*, No. 915CV1083DNHDJS, 2018 WL 7291421, at *14 (N.D.N.Y. Nov. 5, 2018), report and recommendation adopted, No. 915CV1083DNHDJS, 2019 WL 610385 (N.D.N.Y. Feb. 13, 2019), citing *Hare v. Hayden*, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) and *Roseboro v. Gillespie*, 791 F.Supp.2d 353, 369 (S.D.N.Y. 2011) (collecting cases). Moreover, the protected speech had not yet occurred. *See* Section III(C) below.

even if the claim against Officer Beschler were to proceed, the failure to protect claim should be dismissed and Sergeant Claflin terminated from this lawsuit. There is nothing that the sergeant could have done to prevent a single kick, for which there was no advance warning, and not even any conversation about before or after the fact. *See* McKay Decl., Exh 1 at p. 80/15-22; *see, e.g., O'Neill v. Krzeminski*, 839 F.2d 9, 11–12 (2d Cir.1988) (police officer was not liable for excessive force by another officer who punched a prisoner in the face three times in rapid succession, because it "was not an episode of sufficient duration to support a conclusion that [he] . . . became a tacit collaborator."); *Sash v. United States*, 674 F. Supp. 2d 531, 545 (S.D.N.Y. 2009) (dismissing failure to protect claims where plaintiff alleged that other officer "rushed up to him, tackled him to the ground where he was held for five second, and then threw him against a metal wall, and the entire incident took less than thirty seconds"); *Jean–Laurent v. Wilkerson*, 438 F.Supp.2d 318, 327 (S.D.N.Y.2006) (dismissing failure to protect claims where officer allegedly "stood [inmate] to his feet by his collar and then slammed him against the wall, since there was no "reasonable opportunity to intervene in such a rapid series of events.").

## II. "COUNT SEVEN" ALLEGING A RETALIATORY PATFRISK ON JUNE 11, 2013 SHOULD BE DISMISSED

In "Count Seven," Plaintiff takes issue with another pat frisk conducted by C.O. Perry on June 11, 2013, which Plaintiff claims was sexually assaultive in retaliation for reporting the frisk on March 29, 2013. McKay Decl., Exh 1 at 141/3-23; Dkt No. 34 at p. 74; Dkt No. 32 at p. 3.

In a retaliation claim, the plaintiff must advance "non-conclusory" evidence establishing: "(1) he engaged in constitutionally protected activity; (2) the defendant took adverse action against him; and (3) there was a causal connection between the protected activity and the adverse action." *Crenshaw v. Dondrea*, 278 F. Supp. 3d 667, 670 (W.D.N.Y. 2017), citing *Espinal v. Goord*, 554 F.3d 216, 227 (2d Cir. 2009). The Second Circuit has defined "adverse action" as

"conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004).

It is well established in this Circuit that:

> "[C]ourts must approach prisoner claims of retaliation with skepticism and particular care. . . . This is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official--even those otherwise not rising to the level of a constitutional violation--can be characterized as a constitutionally proscribed retaliatory act. . . . Given that such adversity is an ever-present concomitant of prison life, the opportunities to characterize its manifestations as actionable retaliation are far greater than that for society at large."

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), overruled on other grounds *Swierkeiwicz v. Sorema N.A.*, 534 U.S. 506 (2002) (rejecting heightened standards for Eighth Amendment claims); *see also Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015); *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike.").

First, Plaintiff here cannot prove that there was sufficiently adverse action taken against him. *De minimus* retaliation falls "outside the ambit of constitutional protection." *Dawes*, 239 F.3d at 492-93. Plaintiff's second pat frisk was conducted in much the same manner as the one on March 29, 2013, except Plaintiff admits that there was no penetration. McKay Decl., Exh A at 126/2-127/21. C.O. Perry followed proper procedure, which required him to check Plaintiff for contraband that could be hidden in his genital area or between his buttocks, Perry Decl. ¶12, and Plaintiff admits that he suffered no physical injury whatsoever. McKay Decl., Exh 1 at 131/5-6; *see also* McKay Decl., Exh 10 at p. 6. As on March 29, 2013, C.O. Perry made no derogatory or offensive remarks. McKay Decl, Exh 1 at 129/3-7.

Accordingly, "based on the evidence in the record, such a solitary pat-frisk (even [if it had been] accompanied by callous and/or offensive remarks[, which it was not]) does not even rise to the level of adverse action for purposes of a First Amendment retaliation claim." *Allen v. Graham*, No. 16-CV-0047, 2017 WL 5957742, at *7 (N.D.N.Y. Dec. 1, 2017); citing *Amaker v. Fischer*, 10-CV-0977, 2014 WL 8663246, at *3 (W.D.N.Y. Aug. 27, 2014) (recommending the dismissal of First Amendment retaliation claim for lack of adverse action where defendant allegedly sexually assaulted plaintiff during a pat-frisk by "rubbing plaintiff's penis, fondling and squeezing plaintiff's buttocks and running his index finger across plaintiff's anus," while defendant criticized plaintiff for writing grievances), adopted by 2015 WL 1822541 (W.D.N.Y. Apr. 22, 2015). Indeed, as the Second Circuit has pointed out, "prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Dawes*, 239 F.3d at 491.

Second, Plaintiff cannot establish a causal connection between his reporting of the March 29, 2013 events and the random pat frisk that took place more than two months later. McKay Decl., Exh. 1 at 141/3-23. To satisfy the causation requirement, Plaintiff must provide evidence "to support the inference that the speech played a substantial part in the adverse action." *Davis v. Goord*, 320 F.3d 346, 354 (2d Cir. 2003). Inmates are checked for weapons and contraband every time they go to recreation, and, as Plaintiff admits, he was not always selected to be frisked. McKay Decl., Exh. 1 at 44/17-45/12; Exh 2 at 66/2-10. C.O. Perry's job required him to conduct searches on a daily basis, meaning he conducted countless pat frisks for weapons and contraband, Perry Decl. at ¶4; yet, Plaintiff cannot recall a single other pat frisk he experienced between the two dates at issue, McKay Decl., Exh 1 at 124/21-23. Nor was anything said that shows a retaliatory motive. Besides ordering Plaintiff to "get on the wall," C.O. Perry said

nothing to him throughout the entire frisk. *Id.* 129/3-7. After it was completed, C.O. Perry simply told Plaintiff to grab his belongings and be on his way. *Id.* 128/7-12. The frisk was conducted in the presence of many other people, including inmates and at least four supervisors, who were mere feet away, and Plaintiff was fully clothed throughout. *Id.* 129/8-130/22.

Moreover, C.O. Perry conducted the June 11, 2013 pat frisk for legitimate penological reasons, i.e., to ensure the safety of staff and other inmates when they went to the yard for recreation. Perry Decl. ¶7. Thus, even if a question of fact were to exist as to whether there may have been an impermissible motivation, the undisputed facts demonstrate that there was at least another, valid reason for the frisk. *See Deane v. Dunbar*, 777 F.2d 871, 877 (2d Cir. 1985). In cases such as this, even if the plaintiff presents a prima facie case of retaliation, the defendant has an opportunity "to articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Further, in some cases, "the basis for the adverse action is not either the improper or proper reason, but both reasons." *Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 877 (2d Cir. 1988). This dual motivation issue focuses on whether the prison official would have taken the adverse action regardless of any punitive motivation. *Id.*; *see Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977); *Sher v. Coughlin*, 739 F.2d 77, 80-82 (2d Cir. 1984). Here, because Plaintiff was on his way to the Rec yard, he was properly subject to a pat frisk and his claim should be dismissed.

## III. "COUNT EIGHT" AGAINST C.O. SCHIEBER SHOULD BE DISMISSED

In "Count Eight," Plaintiff alleges that, on July 26, 2013, he was sexually assaulted during a pat frisk and retaliated against in a false misbehavior report by C.O. Schieber. Docket No. 34 at p. 82. Because Plaintiff failed to exhaust his administrative remedies and there is no evidence to support these claims, "Count Eight" should be dismissed.

### A. Plaintiff failed to exhaust his claims against C.O. Schieber.

Preliminarily, Plaintiff failed to timely grieve his sexual assault and retaliation claims pertaining to the events on July 26, 2013. It is well settled that prisoners must complete the DOCCS grievance process to satisfy the exhaustion requirement in 42 U.S.C. § 1997e(a):

> To satisfy that requirement, prisoners in New York must ordinarily follow a three-step DOCS grievance process. The first step in that process is the filing of a grievance with the Inmate Grievance Resolution Committee. Next, the inmate may appeal an adverse decision to the prison superintendent. Finally, the inmate may appeal the superintendent's decision to the Central Office Review Committee ("CORC").

*Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010) (citations omitted).

"Proper exhaustion" requires a prisoner to use "all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir.2006), quoting *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (emphasis in original). "PLRA exhaustion thus 'demands compliance with an agency's deadlines and other critical procedural rules.'" *Id*. In other words, the PLRA's requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Id*., citing *Woodford*, 548 U.S. at 83–84; *see Woodford*, 548 U.S. at 95 ("For example, a prisoner wishing to bypass available administrative remedies could simply file a late grievance without providing any reason for failing to file on time. If the prison then rejects the grievance as untimely, the prisoner could proceed directly to federal court.... We are confident that the PLRA did not create such a toothless scheme.").

Here, the only grievances relating to the July 26, 2013 events are Grievance Nos. EL-42163-14 and GH-80561-15, which Plaintiff did not file until more than six months and two years later, or February 4, 2014 and August 25, 2015, respectively. Docket No. 34 at p. 95; McKay Decl., Exh 2 at 43/12-44/11; McKay Decl., Exh 11 & 12. Although Plaintiff mentioned

24

the pat frisk in Grievance No. EL-42163-14, the focus of that grievance was subsequent events that were still timely, which are the subject of Plaintiff's other claims and addressed below in this Memorandum. McKay Decl, Exh 11. Hence, the Deputy Superintendent of Security who investigated that grievance in February 2014 merely noted that "the allegations of sexual assault are untimely for the grievance process." *Id.* at p. 16; *see* N.Y. Comp. Codes R. & Regs. § 701.5(a)(1) ("An inmate must submit a complaint to the clerk within 21 calendar days"). Likewise, Grievance No. GH-80561-15, pertaining to the misbehavior report, was properly rejected as untimely. McKay Decl, Exh 12. Particularly because Plaintiff filed an unrelated grievance only six days later on August 3, 2013, and countless other grievances in the months and years thereafter, the process was obviously available to him and he did not timely avail himself of it. *See* McKay Decl., Exh 17; McKay Decl., Exh 2 at p. 90/15-91/20.

Besides citing Grievance No. GH-80561-15, Plaintiff asserts in his complaint that "this claim is not a prison condition. No exhaustion requirement is needed." Docket No. 34 at p. 95. However, "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Accordingly, Plaintiff failed to "properly exhaust" both of the claims contained in "Count Eight," which must therefore be dismissed.[5] *See Baines v. McGinnis*, 766 F. Supp. 2d 502, 504 (W.D.N.Y. 2011).

---

[5] DOCCS' change to its directive on May 15, 2014, to allow for a "streamlined exhaustion requirement for an inmate alleging an 'incident of sexual abuse or sexual harassment,'" is inapplicable, as it post-dates the events at issue in this lawsuit. *McCray v. City of Albany*, No. 13-CV-949, 2017 WL 1433336, at *2 (W.D.N.Y. Apr. 24, 2017). "At the time of the incident of which the Plaintiff complains, . . . Directive 4040 did not contain language simplifying an inmate's obligation to exhaust claims of sexual assault. And, as the Court has previously held, the language in the updated version of Directive 4040 . . . is not retroactive." *Id.*, citing Directive 4040 (July 12, 2006); *Henderson v. Annucci*, 14-CV-445A, 2016 WL 3031353, at *1 (W.D.N.Y. May 27, 2016), *adopting Report and Recommendation*, 2016 WL 3039687 (Mar. 14, 2016). In any event, Plaintiff's letter to the Office of Special Investigations regarding C.O. Schieber pertained to an entirely separate pat frisk conducted on a different inmate, which Plaintiff witnessed and also interpreted as assaultive. McKay Decl., Exh B at 69/15-70/6, 74/17-24, 77/11-13; 78/22-79/22; McKay Decl., Exh 16 ("I saw C.O. Schieber reach and feel inmate Green's groin area and anus.").

**B. There is no evidence of sexual assault by C.O. Schieber on July 26, 2013.**

Even if Plaintiff had properly grieved "Count Eight," it should still be dismissed because he has no evidence to establish that a sexual assault occurred. The legal standard is set forth in Section I(B) above and will therefore not be repeated here.

The July 26, 2013 pat frisk by C.O. Schieber occurred while Plaintiff was going to recreation. McKay Decl., Exh 2 at 21/15-20. Plaintiff went through the metal detector without setting off an alarm, which forms the basis for Plaintiff's conclusory claim that the frisk was "needless." *Id*. at 37/17-22. Rather than being singled out, Plaintiff and at least one other inmate were selected to be frisked by the area supervisor. *Id*. at 25/24-26/5; Schieber Decl. ¶6. Plaintiff had never met C.O. Schieber before that day. *Id*. 20/11-13, 20/19-21 & 51/4-7. Again, the pat frisk appears to have been conducted in a manner that fully complies with DOCCS procedure, except for Plaintiff's allegation that his rectum was penetrated through his clothing for "two seconds" while the officer checked his buttocks. *Id*. at 27/3-9 & 27/15-17. However, it is undisputed that C.O. Schieber made no derogatory comments throughout the entire exchange; no one said anything at all during the frisk. *Id*. at 30/2-10. Again, there were other officers and inmates in the area, and C.O. Schieber never had skin-to-skin contact with Plaintiff. *Id*. at 27/3-9. And Plaintiff does not claim to have suffered any physical injury from the pat frisk. *Id*. at 49/8-10. Although he claims that he had to use the bathroom during the frisk and experienced a bowel movement while walking back to his cell afterwards, Plaintiff has no proof that this occurred. *Id*. at 27/18 to 28/7. Plaintiff's medical records make no reference to it; he did not even seek medical care until a week later, on August 2, 2013, when he utterly neglected to mention an "accident." *Id*. at 106/3-14; McKay Decl., Exh 10 at p. 7. This claim should be dismissed. *Shaw*, 661 Fed. Appx. at 19; *Allen*, 2017 WL 5957742 at *6; *Jones*, 2013 WL 4804500 at *19.

26

**C. There is no evidence that C.O. Schieber retaliated on July 26, 2013.**

Plaintiff alleges that C.O. Schieber filed a false misbehavior report against him as a form of *preemptive* retaliation because the officer believed that Plaintiff would later file a grievance for sexual assault. McKay Decl., Exh 2 at 40/18-42/22. In order to establish a First Amendment retaliation claim, a prisoner must demonstrate that: "(1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009).

First, Plaintiff essentially claims that C.O. Schieber attempted to prevent him from filing a grievance *in the future*, rather than responding to protected speech or conduct that had already occurred. "However, allegations of preventative action are not actionable as a First Amendment retaliation claim." *Fabricio v. Griffin*, No. 16 CV 8731, 2019 WL 1059999, at *8 (S.D.N.Y. Mar. 6, 2019), citing *Davis v. Jackson*, 2016 WL 5720811, at *9 (S.D.N.Y. Sept. 30, 2016) ("[T]here is no First Amendment cause of action for anticipatory retaliation.") (citing *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)). Moreover, even if such a claim was cognizable, Plaintiff has insufficient evidence that C.O. Schieber anticipated that he would file a grievance. *See generally White v. Smiths Med. ASD, Inc*., No. 3:14-CV-01501-VLB, 2016 WL 5219450, at *3 (D. Conn. Sept. 20, 2016) (rejecting plaintiff-employee's "novel legal theory" of "preemptive or anticipatory retaliation" based on insufficient facts demonstrating that defendant-employer "anticipated a claim for workers' compensation"). According to Plaintiff, he merely asked the officer for his name, and the officer told it to him. *See* McKay Decl., Exh 2 at 30/14-22. Even crediting Plaintiff's subsequent addition to his testimony that C.O. Schieber asked him why he wanted to know, Plaintiff still did not state an intention to file a grievance, but merely said, "You

touched my asshole," at which point the officer gave him his name. *Id.* at 31/2-25.

In any event, Plaintiff cannot demonstrate a causal connection between his grievance and the misbehavior report. "For the third prong, . . . a court may consider a number of factors, including 'any statements made by the defendant concerning his motivation' and 'the temporal proximity between the protected activity and the defendant's adverse action.' In the context of retaliatory false misbehavior reports, a court may also consider the plaintiff's prior good disciplinary record and whether he was vindicated at the subsequent disciplinary hearing." *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011). Reviewing the factors in turn, there were no statements made by C.O. Schieber to indicate a retaliatory motive. If anything, the officer was forthcoming in giving Plaintiff his name, which hardly demonstrates an intent to silence Plaintiff in a constitutional sense. *See* McKay Decl., Exh B at 30/14-22. Next, as discussed in Section V(B) above, Plaintiff did not even file any grievances accusing C.O. Schieber of sexual assault and retaliation until more than six months and two years later. This undermines Plaintiff's claim that the officer must have known of a plan to report him, since no such plan apparently did exist for quite some time. But even if C.O. Schieber had known of such an intention, there is no "admissible record evidence from which a rational factfinder could conclude that [he] had reason to believe, at the time the misbehavior report was issued, Plaintiff would actually follow through with his one-time oral statement, made on the heals of a heated incident." *Henry v. Dinelle*, 2011 WL 5975027, at *8 (N.D.N.Y. Nov. 29, 2011).

Lastly, Plaintiff's disciplinary history severely undercuts his claim of retaliation. At the time that C.O. Schieber wrote him up, Plaintiff already had no fewer than eleven prior disciplinary convictions for, amongst other things, disobeying direct orders, violent conduct, and assault on staff. *See* McKay Decl., Exh 13 (disc hist report – 19 at depo). Although Plaintiff's

disciplinary determination was eventually reversed for unknown reasons following the filing of a

CPLR Article 78 petition, *see* McKay Decl., Exh 2 at 48/3-8, Plaintiff was certainly not

vindicated at his hearing. *See* McKay Decl., Exh 14. Rather, the Hearing Officer found Plaintiff

guilty of all charges based on the testimony of not just C.O. Schieber, but also Sergeant Collmer,

as well as Plaintiff's own disruptive behavior during the hearing, including his "interruptions and

accusations during testimony," which "ma[d]e it apparent . . . that this was an attempt on

[Plaintiff's] part to discredit the hearing and take control of the proceedings." *Id.* at p. 8.

## IV. "COUNT NINE" AGAINST C.O. SCHIEBER SHOULD BE DISMISSED

In the claims remaining from "Count Nine," Plaintiff alleges cold cell conditions and

C.O. Schieber retaliated against him for reporting it to OSI. *See* Docket No. 34 at p. 95-111;

Docket No. 9 at p. 32-34. For the reasons set forth below, these claims should be dismissed.

### A. C.O. Schieber was not personally involved in or deliberately indifferent towards Plaintiff's cold cell conditions, which in any event do not rise to the level of a constitutional violation.

No reasonable factfinder could conclude that Plaintiff has proven a constitutional

conditions of confinement claim, let alone that C.O. Schieber, who merely took Plaintiff to

recreation later after the windows were closed, was personally involved in such violation.

> "[I]n order for conditions of confinement to constitute a violation of the Eighth
> Amendment, a prisoner must satisfy a two-part test comprised of both an objective
> and subjective prong." *Williams v. Carbello*, 666 F.Supp.2d 373, 378
> (S.D.N.Y.2009) (citing Farmer v. Brennan, 511 U.S. 825, 834 (1994)). First, "the
> deprivation alleged by the prisoner must be in objective terms 'sufficiently serious'
> such that the deprivation 'den[ied] the minimal civilized measure of life's
> necessities.'" *Branham v. Meachum*, 77 F.3d 626, 630–31 (2d Cir.1996) (quoting
> *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Second, "the prison officials must have
> acted with deliberate indifference in that they 'kn[ew] of and disregard[ed] an
> excessive risk to inmate health or safety.'" *Id*. (quoting *Hathaway v. Coughlin*, 37
> F.3d 63, 66 (2d Cir.1994)).

*Stevens v. City of New York*, 10 CIV 5455, 2011 WL 3251501, at *2 (S.D.N.Y. July 22, 2011).

As a preliminary matter, there is no evidence that C.O. Schieber was personally involved in the cold cell conditions. "Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). Thus, "[i]n order to prevail on a section 1983 cause of action against an individual, a plaintiff must show a 'tangible connection between the acts of a defendant and the injuries suffered.'" *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Here, according to Plaintiff, there were six officers working in the area when the windows were open, and none of them was C.O. Schieber. McKay Decl., Exh B at 61/9-12; 64/7-9. Plaintiff did not see C.O. Schieber until it was time for evening recreation around 7:00 p.m., by which time the windows were already closed. *Id.* at 64/13-25. Plaintiff does not recall seeing C.O. Schieber anytime earlier that day. *Id.* at 65/8-12.

Next, the temporary conditions that Plaintiff describes were not "sufficiently serious." "Exposure to freezing temperatures may constitute a Fourteenth Amendment violation, . . . but a claim based on exposure must be premised on a threat to health or safety that existed for a prolonged period." *Stevens*, 2011 WL 3251501, at *3, citing *Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir.2003) (affirming summary judgment where plaintiff did not allege that he was "directly exposed for lengthy periods to winter weather," and "there is simply no factual dispute regarding whether the temperature in his cell posed a threat to his 'health or safety' ").

At his deposition, Plaintiff testified to cold conditions in his cell on a single night in January 2014, when another inmate requested that the window be left open. McKay Decl., Exh 2 at 52/3-19. Plaintiff slept through the bulk of the alleged exposure, and he learned about what had transpired when he awoke. *Id.* at 53/2-11, 55/10-21. Although Plaintiff's testimony is a bit unclear as to what exact time the window was closed—at one point, he testified that it was closed

by the time he returned from breakfast meal, but he later testified that it was not closed until the dinner meal—Plaintiff clearly indicated it was closed later that same day. *Id.* at 57/2-19, 58/4-9; *see Miller v. Netto*, No. 3:17CV362(KAD), 2019 WL 4646973, at *9 (D. Conn. Sept. 24, 2019) (dismissing claim of exposure to "cold temperatures for at most, nineteen hours"). Furthermore, Plaintiff was not in an observation cell, was fully clothed, and had access to his bedding. He had no injuries; the cold did not even disturb his sleep. McKay Decl., Exh 2 at 53/2-11, 55/10-21.

Thus, "the facts are analogous to those in cases in which courts have found that exposure to cold was not sufficiently severe or prolonged to constitute a constitutional violation. *Stevens*, 2011 WL 3251501, at *4, citing *Smith v. Burge*, No. 9:03–CV–0955 (LEK/GHL), 2006 WL 2805242, at *7 (N.D.N.Y. Sept. 28, 2006) (no violation where, "at most, Plaintiff was deprived of various property [except for a T-shirt and underwear] for less than one day while confined to a cell that was 'cold' or 'very cold' due to some gallery windows being open in late-March"); *Borges v. McGinnis*, No. 03–CV–6375 CJS, 2007 WL 1232227, at *6 (W.D.N.Y. Apr. 26, 2007) (keeping inmate clothed only in paper gown and slippers, with a thin mattress pad and no blanket, in a room with an open window that reduced the temperature to approximately 50 degrees, for three days, insufficient to satisfy objective prong); *Grant v. Riley*, No. 89 Civ. 0359(MBM), 1993 WL 485600, at *4 (S.D.N.Y. Nov. 24, 1993) (confining inmate for three days in unheated room with cold wind blowing through broken window, and denying him a coat, bedding, or blankets for over nine hours, does not rise to Eighth Amendment violation). Finally, there is no evidence that C.O. Schieber even knew about the cold conditions, let alone was deliberately indifferent towards them. *See* McKay Decl., Exh 2 at 53/2-5, 61/9-62/14, 64/7-25.

**B. There is no evidence that C.O. Schieber retaliated on February 3, 2014.**

Plaintiff further alleges in "Count Nine" that C.O. Schieber retaliated by going to

Plaintiff's cell on February 3, 2014, and saying, "[h]ey cinnamon, why didn't you come out today? When you come out [of] your cell I'm going to f--- you up! You little bitch." Docket No. 9 at p. 33. This claim should be dismissed because C.O. Schieber's alleged conduct does not rise to the level of "adverse action," and there is no evidence whatsoever to demonstrate causation.

First, "[v]erbal harassment itself does not rise to the level of a constitutional violation. Verbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 364 (N.D.N.Y. 2010). "The opacity of [Schrieber's] threats . . . softens the deterrent effect considerably"; "[s]o does the fact that [Schieber] evidently never followed through on these threats." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010). Second, there is no causal connection between Plaintiff's purportedly protected speech and C.O. Schieber's adverse action. Here, causation fails on multiple levels. There is no evidence that C.O. Schieber was ever made aware that Plaintiff had reported him to OSI, and certainly not as of February 3, 2014. Plaintiff did not inform anyone that he had written to OSI, and the OSI investigator did not visit the facility until February 4, 2014, i.e., the day *after* C.O. Schieber allegedly made those comments to him. McKay Decl., Exh B at 85/5-11. Even then, the investigator did not meet with C.O. Schieber, but rather met with Plaintiff and inmate Greene. *Id*. at 74/3-24. In addition, because the investigation was of an incident involving inmate Greene,[6] not Plaintiff, there is no reason to believe that C.O. Schieber would have known that Plaintiff had anything to do with it, even if any allegations had been substantiated, which they were not. *Id.* at 80/5-10.

## V.     "COUNT ELEVEN" AGAINST C.O. SCHIEBER SHOULD BE DISMISSED

---

[6] Plaintiff admitted at his deposition that he was not present during the alleged beating of inmate Greene, he did not even see inmate Greene at any time after it, and he merely presumed that inmate Greene had gone to SHU because he was no longer in his cell when Plaintiff returned from recreation. McKay Decl., Exh B at 72/8-73/22. In fact, Plaintiff based his entire report to OSI on nothing more than an assumption that C.O. Schieber had beaten him up without any evidence whatsoever. *Id.* at 74/3-8.

"Count Eleven" contains a slew of conclusory allegations against C.O. Schieber, including that he retaliated against Plaintiff for "his sexual gratification as a sexual predator and made sexual advancement (sic) toward Plaintiff in homosexual idiosyncrasies (sic)." Docket No. 34 at p. 126. Specifically, Plaintiff alleges: (1) on February 10, 2014, C.O. Schieber blew a kiss into his cell and called him, "faggot!"; (2) on February 11, 2014, C.O. Schieber "with deliberate indifference state[d]: "Come out your cell to get your ass whipping!"; and (3) on February 12, 2014, C.O. Schieber said, "hey girl, what are you working on? Don't hide in your cell! Come out tomorrow to get your ass whipping! You're always bitching and writing grievances!" *Id.* at p. 127-31. As discussed below, however, Plaintiff failed to exhaust two of the three incidents, the alleged verbal harassment falls short of adverse action, and Plaintiff cannot demonstrate a nexus between the so-called "sexual advances" and his report to OSI.

**A. Plaintiff failed to exhaust his retaliation claims against C.O. Schieber.**

Preliminarily, Plaintiff did not grieve his retaliation claims pertaining to February 11 and 12, 2014. The exhaustion requirements are set out in Section III(A) above. Plaintiff's only grievance pertaining to these alleged "sexual advances" by C.O. Schieber is Grievance No. EL-42205-14, and in that grievance, he describes only the February 10, 2014 comments. McKay Decl., Exh 15 at p. 5; McKay Decl., Exh 2 at 90/15 to 91/4. When that grievance was investigated on February 14, 2014, Plaintiff did not have anything further to add. McKay Decl., Exh 15 at p. 11. Thus, Plaintiff's claims regarding February 11th and 12th should be dismissed.

**B. There is no evidence that C.O. Schieber retaliated on February 10, 11, or 12, 2014.**

As noted in Section IV(B) above, "verbal harassment and name-calling on the part of prison officials do not constitute actionable constitutional violations." *Barnes v. Cty. of Monroe*, 85 F. Supp. 3d 696, 740 (W.D.N.Y. 2015), citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d

Cir.1986) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed"); *Tafari v. Paul*, No.06–CV–0603, 2009 WL 3260075, at *1 (W.D.N.Y. Oct. 8, 2009) (verbal harassment or abuse, "without a showing of an actual injury, are insufficient to support a § 1983 claim"). "[A]llegations of de minimis acts of retaliation are not cognizable" in a § 1983 action." *Treizon Lopez v. Semple*, No. 18-CV-1907, 2019 WL 2548136, at *4 (D. Conn. June 20, 2019). Thus, "[v]erbal abuse, vulgarity, and even threats are insufficient to rise to the level of constitutional violations." *Id.*, quoting *DeJesus v. Tierney*, No. 9:04–CV–298, 2006 WL 839541, at *11 (N.D.N.Y. Mar. 28, 2006).

"It is true that some verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action." *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011). However, "[s]uch statements are only sufficiently adverse for the purpose of a First Amendment retaliation claim if they "would deter a similarly situated individual of ordinary firmness of exercising constitutional rights." *Hayes v. Dahkle*, No. 16CV1368, 2017 WL 9511178, at *7 (N.D.N.Y. Oct. 30, 2017), adopted as modified, 2018 WL 555513 (N.D.N.Y. Jan. 19, 2018), quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004).). "The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights." *Id.*, citing *Mateo v. Fischer*, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010).

Here, the verbal harassment is *de minimus*, and any alleged threat far too general to rise to the level of adverse action that would deter an inmate from exercising his free speech rights. "[T]he Second Circuit has observed that '[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse.'" *Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007) (Larimer, J.), quoting *Dawes v. Walker*, 239 F.3d 489, 492

(2d Cir. 2001), overruled on other grounds, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). While unpleasant, the statements that C.O. Schieber is accused of making only vaguely reference violence, and clearly did not amount to any action taken against Plaintiff. Plaintiff attended recreation and kept writing multiple grievances about prison conditions, and C.O. Schieber did not beat him up. McKay Decl., Exh 1 at 102/9-15; McKay Decl., Exh 17. Indeed, Plaintiff claims no physical injuries from these events whatsoever. McKay Decl., Exh 2 at 83/19-23.

Finally, there is no causal nexus between the alleged threats and Plaintiff's report to OSI. C.O. Schieber did not even know about the OSI report, which was resolved with a finding of "unsubstantiated." McKay Decl., Exh 2 at 80/5-10. As Plaintiff explained, "they found out that there was no merit." *Id.* Unlike grievance investigations at the facility level, which may require a written response, OSI investigations are kept confidential unless taped testimony becomes necessary. Schieber Decl. ¶12. Plaintiff's conclusory claim that C.O. Schieber knew "[b]ecause they always know," is wholly inadequate. McKay Decl, Exh 2 at 77/3-10.

## VI.    PLAINTIFFS CLAIMS ARE INCREDIBLE AS A MATTER OF LAW

Although summary judgment is not designed to address credibility, the narrow exception from *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) applies here because Plaintiff's claims are incredible as a matter of law and no reasonable jury could credit them. "In *Jeffreys*, the Second Circuit held that in the 'rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete,' the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 364 (N.D.N.Y. 2010). Plaintiff's claims of sexual assault are based on his mistaken belief that he should not be subject to "needless" pat frisks in prison when he does not set off the metal detector. McKay Decl, Exh 1 at 61-62; 127-128; 2-37.

His claims that he was penetrated through two, if not three, layers of clothing, not once, but twice, and by two separate correction officers, is incredible as a matter of law. Without any proof, Plaintiff alleges that multiple staff at Elmira are "homosexuals" and "sexual predators," who speak to him in "innuendo," while making otherwise nonsexual statements. *Id.* at 61/15-18; McKay Decl, Exh 2 at 84/10-20; Docket No. 34 at p. 116. Plaintiff's mental health records demonstrate complaints about "sexual abuse" and "sexual assault," but note:

> "his definition . . . refers only to being called a 'faggot' and 'cinnamon.' He has repeatedly denied any actual physical touching of any kind of anything else of concern. He seems to often overstate his concerns, as he has with his 'memory loss,' 'depression,' and 'sexual abuse' given that when his blanket statements are discussed further, it becomes apparent that his labels don't typically follow generally accepted definitions of these things."

McKay Decl, Exh 18 at p. 3-4. This is reinforced by Plaintiff's admission that he reported C.O. Schieber for beating up another inmate without witnessing any of it or even seeing the other inmate afterwards, and for opening the windows near his cell, even though Plaintiff was asleep when it occurred and the first time he saw C.O. Schieber was after the window had been closed.

## VII. DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Even if any of Plaintiff's claims were to survive, Defendants are entitled to qualified immunity, since they did not violate clearly established laws in effect at the time of the alleged events, and it was objectively reasonable for them to believe that they were acting lawfully.

"Under the doctrine of qualified immunity, a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). "A right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing

violates that right. *The unlawfulness must be apparent.*" *McEvoy v. Spencer*, 124 F.3d 92, 96 (2d Cir. 1997) (emphasis added). In other words, the existing precedent must have placed the unlawfulness of the officials' conduct "beyond debate." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). "An officer's actions are objectively reasonable if officers of reasonable competence could disagree on the legality of the defendants' actions." *Ford v. Moore*, 237 F.3d 156, 162 (2d Cir. 2001). The Supreme Court has repeatedly made clear that "the clearly established law must be 'particularized' to the facts of the case," not "defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (Jan. 9, 2017); *see Mullenix v. Luna*, 136 S. Ct. 305, 308 (Nov. 9, 2015). The qualified immunity defense "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Officials are "not expected to know all of [the Second Circuit's] precedents or those of the Supreme Court, or to distinguish holding from dicta, or to put together precedents for line-drawing, or to discern trends or follow doctrinal trajectories." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 162 (2d Cir. 2013).

In *Shannon v. Venettozzi*, 749 Fed. App'x 10, 11 (2d Cir. 2018), the inmate-plaintiff alleged that in 2011, he suffered several incidents of sexual misconduct where a correction officer fondled and grabbed the plaintiff's genitalia.[7] The Second Circuit affirmed the granting of the defendant-correction officer's motion to dismiss on qualified immunity grounds, explaining,

> in *Boddie*, we had held that a "small number of incidents in which [the plaintiff] allegedly was verbally harassed, touched, and pressed against without his consent" was not sufficient to state a claim. 105 F.3d at 861. And, prior to our decision in *Crawford*, district courts had routinely interpreted *Boddie* to mandate the dismissal of similar claims at the pleading stage In line with this conclusion, we recently affirmed the district court's grant of qualified immunity in *Crawford* itself, explaining "[a]t a minimum, any constitutional distinction

---

[7] Specifically, plaintiff Shannon alleged that "Officer Jermaine McTurner required him to undergo 'aggressive and very provocative' pat-frisk searches, during which the officer 'hit [Shannon's] genitalia hard,' 'rammed his hands into [Shannon's] testicles very hard,' 'fondl[ed Shannon's] genitals,' and 'rubbed his buttocks.'" *Shannon v. Venettozzi*, 670 Fed. App'x 29, 31 (2d Cir. 2016).

between [Crawford's] case and *Boddie* was not clearly established" in 2011, when the conduct in *Crawford*, too, allegedly occurred. *See Crawford v. Cuomo*, 721 Fed. App'x 57, 59 (2d Cir. 2018) (summary order). The same is true here. We therefore affirm the District Court's grant of Officer McTurner's motion to dismiss on qualified immunity grounds.

*Shannon*, 749 Fed. App'x at 12 (internal citations omitted).

Here, too, all of Plaintiff's alleged incidents predate the Second Circuit's decision in *Crawford* on August 11, 2015. *See Crawford v. Cuomo*, 796 F.3d 252 (2d Cir. 2015). And the sexual assault claims in this case involve nothing more than pulling up Plaintiff's underwear and checking between his buttocks, with two occasions where Plaintiff claims that the officers' finger invaded his rectum through his clothes. Even assuming, *arguendo*, that those allegations would now suffice under current law, there was no clearly established precedent for that as of 2013, when the subject pat frisks occurred. *See, e.g., Boddie v. Schneider,* 105 F.3d 857, 861 (2d Cir. 1997) (holding that several instances of alleged sexual harassment and touching, though "despicable" and "potentially . . . the basis of state tort actions," "d[id] not involve a harm of federal constitutional proportions as defined by the Supreme Court"); *Jones v. Rock*, No. 12-CV-0447, 2013 WL 4804500, at *19 (N.D.N.Y. Sept. 6, 2013) (dismissing claim that officer "pulled Plaintiff's pants up as high as they would go causing Plaintiff to wince in pain," "shoved his fingers between Plaintiff's buttocks with such force that one of his fingers, along with Plaintiff's pants and underwear, invaded Plaintiff's anus," and made demeaning comments); *Wellington v. Langendorf*, No. 9:12-CV-1019, 2013 WL 3753978, at *8 (N.D.N.Y. July 15, 2013) (dismissing allegation that during a pat frisk, defendant-officer "rubbed the front of his body against the plaintiff's buttocks, making a grinding motion, while whispering in plaintiff's ear that he wanted to 'see [plaintiff's] black snake'"); *Irvis v. Seally*, No. 9:09-CV-543, 2010 WL 5759149, at *4 (N.D.N.Y. Sept. 2, 2010), report and recommendation adopted, No. 9:09-CV-543 GLS/ATB, 2011 WL 454792 (N.D.N.Y. Feb. 4, 2011) (dismissing allegations that, during three separate

strip searches, the defendant-officer "grabbed plaintiff's penis," "had plaintiff bend at the waist . . . and spread [his] butt cheeks . . . while [the officer] was rubbing his crotch," "grabbed plaintiff's naked butt cheek while stroking [the officer's] exposed penis with his other hand," and "offered plaintiff cigarettes if plaintiff would show [the officer] his erect penis"), *adopted* 2011 WL 454792 (N.D.N.Y. Feb. 4, 2011); *Williams v.. Keane*, No. 95 Civ. 379, 1997 U.S. Dist. LEXIS 12665, 1997 WL 527677, at *11 (S.D.N.Y. Aug. 25, 1997) (dismissing allegation that officer put hand down inmate's pants and fondled inmate's genitals during frisk search).

In fact, numerous courts previously held that allegations of sexual abuse during frisk searches do not even implicate the Eighth Amendment. *See Irvis*, 2010 WL 5759149, at *4, citing *Morrison v. Cortright*, 397 F. Supp. 2d 424, 424-425 (W.D.N.Y. 2005) (dismissing allegations that officer "shone a flashlight 'up [plaintiff's] anus," ran "his middle finger between plaintiff [sic] buttocks in a wiping fashion causing plaintiff to urinate," and "rubbed up against plaintiff buttocks with his private part during the strip frisk"); *Davis v. Castleberry*, 364 F. Supp. 2d 319, 321 (W.D.N.Y. 2005) (dismissing allegation that, during a pat frisk, officer "reache[d] around the front of [plaintiff's] pants zipper area and grabbed [plaintiff's] penis"); *Montero v. Crusie*, 153 F. Supp. 2d 368, 375 (S.D.N.Y. 2001) (dismissing allegations that officer "squeezed plaintiff's genitalia," "offered plaintiff various extra privileges, including extra food and extra shower time, in exchange for sexual favors," "made a series of death threats to him," and spread rumors that "plaintiff was a 'homosexual and faggot' who 'loves little boys' and 'is doing time for rape.'"). Accordingly, C.O. Perry and C.O. Schieber are entitled to qualified immunity as a matter of law on Plaintiff's sexual assault claims.

Relatedly, as to the failure to intervene claim against Sergeant Claflin and C.O. Beschler, "an officer cannot be held liable in damages for failure to intercede unless such failure permitted

fellow officers to violate a suspect's clearly established statutory or constitutional rights of which a reasonable person would have known." *Shannon*, 749 Fed. App'x at 13. Inasmuch as C.O. Perry is entitled to qualified immunity as a matter of law, it follows that Sergeant Claflin and C.O. Beschler are also entitled to qualified immunity as a matter of law with respect to the claim that they failed to intervene to stop C.O. Perry's alleged conduct. *See id.* ("Because we hold that Shannon's right to be free of the sort of sexual harassment allegedly inflicted upon him by Officer McTurner was not clearly established in 2011, it necessarily follows that he cannot state a claim by alleging that other officers failed to intervene to stop such conduct."); *Crawford*, 721 Fed. App'x at 60 n.2 (observing that the Court's qualified immunity holding as to the claims of sexual abuse "compels the further conclusion that it was likewise not clearly established that [another officer's] deliberate indifference to [the sexual abuse] was unconstitutional.").

Finally, with respect to Plaintiff's other claim against C.O. Beschler, there was no Second Circuit case law in existence at the time of the events at issue establishing that a single kick that "practically trip[s]" an inmate rises to the level of a cruel and unusual punishment. Turning to Plaintiff's remaining claims against C.O. Schieber, it was not clearly established that an officer could not write up an inmate in a misbehavior report if the inmate asks for the officer's name thereby putting him on notice that the inmate may file a grievance sometime in the future, or that vague verbal threats and name-calling could rise to the level of retaliation, even in the absence of evidence that the officer had any knowledge of the inmate's protected speech. Accordingly, Plaintiff's claims should also be dismissed on qualified immunity grounds.

## CONCLUSION

For all the reasons stated above, Defendants respectfully request that the Court dismiss all of Plaintiff's remaining claims.

Dated: February 18, 2021

LETITIA JAMES
Attorney General of the State of New York
*Attorney for Defendants*

 s/ Heather L. McKay
HEATHER L. MCKAY
Assistant Attorney General of Counsel
NYS Office of the Attorney General
144 Exchange Boulevard, Suite 200
Rochester, New York 14614
Telephone: (585) 546-7430
heather.mckay@ag.ny.gov

## CERTIFICATE OF SERVICE

I certify that on February 18, 2021, I electronically filed the foregoing Memorandum of Law on behalf of Defendants with the Clerk of the District Court using CM/ECF system, which sent notification of such filing to the following:

1. n/a

And, I hereby certify that I have mailed, by the United States Postal Service, a copy of the document to the following non-CM/ECF participant(s):

1. Darrell Gunn
   03-B-2443
   SING SING CORRECTIONAL FACILITY
   354 Hunter Street
   Ossining, NY 10562-5498

LETITIA JAMES
Attorney General of the State of New York
*Attorney for Defendants*

 s/ Heather L. McKay
HEATHER L. MCKAY
Assistant Attorney General of Counsel
NYS Office of the Attorney General
144 Exchange Boulevard, Suite 200
Rochester, New York 14614
Telephone:  (585) 546-7430
heather.mckay@ag.ny.gov